**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF ARKANSAS
PINE BLUFF DIVISION**

CHERYL A. RICE                                                                                       PLAINTIFF

V.                                          NO. 5:09CV00093 JTR

MICHAEL J. ASTRUE,
Commissioner, Social
Security Administration                                                                       DEFENDANT

**MEMORANDUM AND ORDER**

**I. Introduction**

Plaintiff, Cheryl A. Rice, has appealed the final decision of the Commissioner of the Social Security Administration (the "Commissioner") denying her claim for Supplemental Security Income ("SSI") and Disability Insurance Benefits ("DIB"). Both parties have filed Appeal Briefs (docket entries #8 and #9), and the issues are now joined and ready for disposition.

The Court's function on review is to determine whether the Commissioner's decision is supported by substantial evidence on the record as a whole and whether it is based on legal error. *Long v. Chater,* 108 F.3d 185, 187 (8th Cir. 1997); *see also* 42 U.S.C. § 405(g). While "substantial evidence" is that which a reasonable mind might accept as adequate to support a conclusion,[1] "substantial evidence on the record as a whole" requires a court to engage in a more scrutinizing analysis:

> "[O]ur review is more than an examination of the record for the existence of substantial evidence in support of the Commissioner's decision; we also take into account whatever in the record fairly detracts from that decision." *Haley v.*

---

[1] *Reynolds v. Chater*, 82 F.3d 254, 257 (8th Cir. 1996).

*Massanari*, 258 F.3d 742, 747 (8th Cir. 2001). Reversal is not warranted, however, "merely because substantial evidence would have supported an opposite decision." *Shannon v. Chater*, 54 F.3d 484, 486 (8th Cir. 1995).

*Reed v. Barnhart*, 399 F.3d 917, 920 (8th Cir. 2005).

On April 12, 2004, Plaintiff filed applications for SSI and DIB, alleging disability since June 10, 2004 (Tr. 256), due to withdrawal and pain in her head, side, and back. (Tr. 68; 79; 118). After Plaintiff's claims were denied at the initial and reconsideration levels, she requested a hearing before an Administrative Law Judge ("ALJ"). On August 2, 2006, the ALJ conducted an administrative hearing, during which Plaintiff and a vocational expert ("VE") testified. (Tr. 305-30).

On January 11, 2007, the ALJ issued a decision holding that Plaintiff was not disabled. (Tr. 29-35). Plaintiff appealed the ALJ's decision to the Appeals Council. On June 25, 2007, the Appeal Council issued an Order vacating the ALJ's decision and remanding the case for "resolution of the following issues": (1) the ALJ's failure to identify or evaluate Plaintiff's bipolar disorder, anxiety disorder, and polysubstance abuse despite medical evidence showing these impairments; (2) the ALJ's failure to evaluate the opinion of examining psychiatrist R. Greg Wooten; (3) the ALJ's failure to obtain updated medical records; (4) the ALJ's inadequate evaluation of Plaintiff's mental impairments in accordance with the psychiatric review technique; (5) the reevaluation of Plaintiff's RFC; and (6) whether further VE testimony was necessary based on the expanded record. (Tr. 23-24).

On November 6, 2007, a new ALJ conducted a second administrative hearing. (Tr. 242-304). Plaintiff, medical examiner Dr. Paul Deyoub, and a VE testified. At the time of the supplemental administrative hearing, Plaintiff was 46-years old, and had completed two years of college. (Tr. 251). Plaintiff had past work experience in the hospitality industry. (Tr. 286).

The ALJ considered Plaintiff's impairments by way of the familiar five-step sequential evaluation process. Step 1 involves a determination of whether the claimant is involved in substantial gainful activity ("SGA"). 20 C.F.R. § 404.1520(a)(4)(I) (2005), §416.920. If the claimant is, benefits are denied, regardless of medical condition, age, education, or work experience. *Id.*, § 404.1520(b), § 416.920.

Step 2 involves a determination, based solely on the medical evidence, of whether the claimant has a "severe" impairment, *i.e.*, an impairment or combination of impairments which significantly limits the claimant's ability to perform basic work activities. *Id.*, § 404.1520(4)(ii), § 416.920. If not, benefits are denied. *Id.*

Step 3 involves a determination, again based solely on the medical evidence, of whether the severe impairment(s) meets or equals a listed impairment which is presumed to be disabling. *Id.*, § 404.1520(a)(iii), § 416.920. If so, and the duration requirement is met, benefits are awarded. *Id.*

Step 4 involves a determination of whether the claimant has sufficient RFC, despite the impairment(s), to perform the physical and mental demands of past relevant work. *Id.*, § 404.1520(4)(iv), § 416.920. If so, benefits are denied. *Id.*

Step 5 involves a determination of whether the claimant is able to make an adjustment to other work, given claimant's age, education and work experience. *Id.*, § 404.1520(4)(v), § 416.920. If so, benefits are denied; if not, benefits are awarded. *Id.*

In his May 15, 2008 decision (Tr. 14-21), the ALJ found that Plaintiff: (1) had not engaged in substantial gainful activity since her alleged onset date; (2) had "severe" impairments consisting of personality disorder, anxiety disorder, borderline intellectual functioning, mood disorder, and drug dependence; (3) did not have impairments meeting a Listing; (4) was not generally credible; (5) had

the RFC for a "reduced range of activity at all exertional levels" as described by the VE in response to a hypothetical question; (6) could not perform her past relevant work; but (7) was able to perform other work in the national economy, including jobs as a laundry worker and linen room attendant. (Tr. 21). Thus, the ALJ concluded that Plaintiff was not disabled.

On February 13, 2009, the Appeals Council denied Plaintiff's request for review of the ALJ's decision, thereby making it the final decision of the Commissioner. (Tr. 5-7). Plaintiff then filed her Complaint appealing that decision to this Court. (Docket entry #1).

## II. Analysis

In Plaintiff's Appeal Brief (docket entry #9 at 13-17), she presents her arguments in a disjointed narrative, under the single heading that the ALJ's RFC assessment was not supported by substantial evidence. Plaintiff's arguments fall into two categories: (1) the ALJ erred in assessing her mental RFC; and (2) the ALJ did not conduct a fair hearing and thereby deprived her of due process.

For the reasons discussed below, the Court concludes that Plaintiff's first argument has merit. In order to understand Plaintiff's argument, it is important to review what transpired during the administrative hearing.

At the beginning of the hearing, Plaintiff' counsel, Mr. Alan Nussbaum, raised "due process concerns" regarding the testimony of psychologist Paul Deyoub, whom the ALJ intended to call to testify as a medical expert.[2]  Nussbaum objected to Dr. Deyoub's testimony on the grounds that: (1) the hearing notice did not indicate that he was going to testify; and (2)  he was going to testify via

---

[2]Dr. Deyoub is a psychologist with a M.S. in clinical psychology and a Ph.D in counseling psychology. (Tr. 51).

telephone.[3]  Nussbaum asserted that, in his opinion and experience, Dr. Deyoub was biased against claimants.  In order to effectively cross-examine Dr. Deyoub concerning his bias against claimants and the circumstances surrounding how and why the ALJ selected him as a witness, Nussbaum argued he was entitled to cross-examine Dr. Deyoub in person.   The ALJ overruled Nussbaum's objection and indicated he would allow Dr. Deyoub to testify via telephone.  (Tr. 248).

Plaintiff testified that she stopped working in June of 2001 due to kidney operation. (Tr. 251-52).  Thereafter, she received unemployment benefits for several months.  (Tr. 252).  She did not apply for disability until 2004 because she "did not know what post-traumatic stress syndrome was." (Tr. 252).  In 2004, she started psychotherapy and was diagnosed with PTSD.  (Tr. 253).  She attributed her PTSD to her boyfriend's suicide in 1998.  (Tr. 254).  Plaintiff described herself as medication compliant, but stated that she had stopped taking Prozac.  (Tr. 254-55).

The ALJ then telephoned Dr. Deyoub so that he could testify.  The ALJ indicated that he would allow Nussbaum to question Deyoub about his qualifications and bias in order to make a ruling about whether he could testify by telephone.  (Tr. 258).

Dr. Deyoub testified that he had read the medical reports in the case.  (Tr. 260).  Nussbaum asked Dr. Deyoub whether he had been contacted by anyone in the ALJ's office about the case.  (Tr. 260). At this point, the ALJ interjected with a series of questions to Dr. Deyoub.  Dr. Deyoub stated that a clerk from the ALJ's office contacted his secretary to confirm his availability on a particular

---

[3]On October 22, 2007, Nussbaum completed an "Acknowledgment of Receipt" regarding the time and place of the administrative hearing.  (Tr. 48).  In the blank space provided for explaining the basis of any objection to the time and place, Nussbaum wrote: "I have no objection to the date and time, however, I have a contention that failure to identify the VE and ME in the hearing notice denies the claimant due process as does taking either of their testimony by phone. Debbie advised me that you [the ALJ] personally requested Paul Deyoub as medical examiner. I will object to his test [sic] pursuant to 20 C.F.R. § 404.1519j. I will object on the basis of bias." (Tr. 48).

time and date. (Tr. 261). However, Dr. Deyoub testified that he did not talk to the ALJ or anyone in the ALJ's office about the case. (Tr. 261-62).

Under resumed questioning from Nussbaum, Dr. Deyoub conceded that he had not examined Plaintiff, but had just conducted a "paper review" of the "treating sources." (Tr. 262). Nussbaum asked Dr. Deyoub whether it would be helpful for him to have watched Plaintiff testify and describe her symptomology, to which the ALJ stated that he was "overruling that question" because Deyoub was not going to ascertain Plaintiff's credibility, but was "here to assist me in making a diagnosis and possibly a [RFC] assessment . . . It's not necessary in this case in his role for him to . . . do any testing of any kind. He simply reviewed the medical records. Now go ahead with your next question. " (Tr. 264).

Nussbaum later objected to Dr. Deyoub expressing an opinion on Plaintiff's limitations. This resulted in the following exchange between the ALJ and Nussbaum:

> ALJ: Mr. Nussbaum, he [Dr. Deyoub] doesn't even know what questions I'm going to ask him yet. . . . So I'm not sure what he's going to [be] relying on as far as his experience, or knowledge or education.
>
> NUSSBAUM: Okay. Well, your honor, based upon the [The Office of Hearings and Appeals' Hearings, Appeals, Litigation and Law Manual — the "HALLEX"] it would appear to me that it's absolutely forbidden to ask him [Dr. Deyoub] to assist you in or assist the [VE] in forming a hypothetical question. If he limits his testimony to meets or equals a listings [sic], signs or symptoms, I'll pass him back. And I'm looking right at the [HALLEX] I gave you a copy of.
>
> ALJ: Just listen to me. He can certainly testify based on his professional qualifications as to whether a claimant meets or equals a listing.
>
> NUSSBAUM: Absolutely.
>
> ALJ: He's also permitted to assist me in the next step if concocting or coming up with a mental [RFC] assessment. So I'm not sure I understand —

NUSSBAUM: Well —

ALJ: — you're wanting to limit his role.

NUSSBAUM: Well, I'm reading the [HALLEX] that I furnished you with a copy before the case. And I don't think it's permitted. Maybe there's another [HALLEX] that does, but may can [sic] talk about signs and symptoms, but I don't think he can assist you in the limitations by just reviewing the records. But you're in charge, and feel free to ask him . . . .

ALJ: An ALJ may not ask an ME what a claimant's RFC is or whether a claimant is or is not disabled. Such decisions must be made by an ALJ.

NUSSBAUM: Right. That's —

ALJ: However, an ALJ, may ask an ME, to provide information and opinions that will help the ALJ —

NUSSBAUM: Okay.

ALJ: — decide these issues.

NUSSBAUM: Okay.

ALJ: All right.

NUSSBAUM: That's the exact language. I read it one way, and I can see you're about to read it another.

(Tr. 264-A-265).

The ALJ then examined Dr. Deyoub. He asked Dr. Deyoub whether Plaintiff had been consistently noncompliant with her medications. (Tr. 266). Dr. Deyoub answered "Yes. There's a reference to that." (Tr. 266). The ALJ stated his concern that Plaintiff had consistent GAF scores from 45 to 50.[4] (Tr. 266). The ALJ asked Dr. Deyoub whether Plaintiff was medication compliant

---

[4] A GAF in the range of 41-50 indicates "Serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." DSM IV-TR at 34.

"at the time those [GAF] scores were created or proposed by those treating physicians?" (Tr. 266). According to Dr. Deyoub, Plaintiff's GAF scores remained consistent with or without her medication compliance, citing a 2004 GAF of 50 and a 2007 GAF of 50. (Tr. 266).

The ALJ then asked Dr. Deyoub the following series of questions:

ALJ: And can you kind of guess would a person who has those consistent [GAF] scores are they generally able to work a job?

DEYOUB: Yeah . . . I mean a GAF of 50 does not mean necessarily that they cannot work. The GAF is also, the GAF is by no means a measure of disability. It was never intended to be that. It's a psychiatric range of global functioning.

ALJ: It's also a snapshot in time in that a person who has a GAF score of 50 one day, for example, could very well have a GAF score of either 60 or 40 the next day. Is that correct?

DEYOUB: Right. And a GAF also could vary just depending on the setting. You could have someone who has serious psychiatric symptoms resulting in a lower GAF and yet that same person might be holding a job and functioning much higher and higher in jobs. GAF has a high psychiatric bias in that it is biased for a person's psychiatric mental health symptoms, not necessarily of how they function or their other occupational skills.

ALJ: Dr. Deyoub, the only reason I'm asking is [sic] making record is that the Appeals Council has remanded a prior denial by a different Judge, simply because that Judge didn't address the GAF scores.[5] And that's why I'm asking you about them.

* * *

DEYOUB: I'll give you an example. Let's say a patient were hospitalized because they were attempting suicide. Their GAF at that moment, at psychiatric hospitalization, might be 20 or 30 just because they have serious psychiatric symptoms and they're in the hospital. But that same patient might have a job. They might be working but they had a suicidal episode. So the GAF is, again, I'm stating here that the GAF is a highly psychiatric in nature, related to psychiatric symptoms.

---

[5]The ALJ's characterization of why the Appeals Council remanded the case, because the previous ALJ "simply . . . didn't address the GAF scores," was a gross misstatement of the reasons given by the Appeals Council for remanding the first ALJ's decision denying benefits. (Tr. 23-25).

It's not an occupational scale.

ALJ:  Right. And even this patient that you're referring to, the hypothetical person after possibly a week or ten days in an appropriate facility, in the appropriate treatment they might be discharged and go back to work the next day. Is that right?

DEYOUB:  Exactly.

ALJ:  All right. Let me ask you a hypothetical question. Let's assume that, well let me first ask you what Mr. Nussbaum's concern was. Did Ms. Rice, based on your review of the records, does she meet or equal any of the listings set out in the Social Security regulations?

DEYOUB: She does not, in my opinion meeting [sic] a listing.

ALJ:  All right. Now, let me ask you another question. Would Ms. Rice based on the medical records in the treatment records that you've reviewed, would she have been able to do unskilled work?

DEYOUB:  Yes. I think she has that capability and has had it. And, you know, she even missed, she even takes a job history of work that is more complicated than unskilled, hotel work and so forth, hotel management and all that. So in terms of unskilled work, I think she does have the ability in that area.

ALJ:  All right. Now let me read a definition of unskilled work and make sure that it complies with your understanding of the definition by the Social Security administration. A person who is able to perform work or interpersonal contact is incidental to the work performed, the complexity of the task is learned and performed by rote with few variables, little judgment, the supervision required would be simple, direct, and concrete. Now is that your definition of unskilled work as you understand it?

DEYOUB:  Yes, sir it is. It was in there with the Social Security definition.

ALJ:  All right. And would a person who is in the treatment and has the signs and symptoms and diagnoses as Ms. Rice, is that consistent with being able to do unskilled work?

DEYOUB:  Consistent.

ALJ:  All right. In the [GAF] scores I think you've already testified, those would have been present with or without strict compliance? Is that right?

>   DEYOUB: Yes I think so.

(Tr. 266-69).

On later cross examination, Dr. Deyoub elaborated on what he believed to be the "problem with GAF":

>   DEYOUB: Here's the problem with GAF. There isn't any person who is under the care of a psychologist or a psychiatrist who has a [INAUDIBLE] record that you will see that has a GAF of much higher [than] 50. This is a problem with the GAF. Now you want to bring the GAF and I'll address it for you. But there are very few, if any, mental health patients that psychiatrists or psychologists in the course of their treatment diagnosis will give a GAF of much higher than this range.
>
>   NUSSBAUM: Dr. Deyoub, I've seen —
>
>   DEYOUB: You usually do not see people who are in treatment with GAF ratings of 70, 80, or 90. And I believe it is a psychiatric and it's a treatment bias . . . [i]nherent in the diagnostic system.

(Tr. 273).

In the ALJ's evaluation of the medical evidence, he seized on Dr. Deyoub's testimony to disregard the evidence of Plaintiff's GAF scores:

>   At the hearing the claimant's counsel questioned the medical expert about how a person with [GAF] score of 45-50 could be expected to work. Dr. Deyoub testified that such a global assessment of functioning is, in essence, a treatment bias. Without such a score, a person wouldn't be expected to need treatment. The medical expert testified that such a score is not a statement about her ability to work. He testified that this claimant and most other claimant's [sic] would be able to work with GAF scores of 45-50 with treatment. Dr. Deyoub also testified that Ms. Rice's GAF scores of 45-50 would be present with or without compliance. Ms. Rice has depression and anxiety and a personality disorder, and has a difficult time with people, but she is able to get out, socialize, and meet boyfriends. The undersigned accepts the testimony of the medical expert.

(Tr. 19).

The ALJ's reliance on Dr. Deyoub's testimony to categorically reject the evidence of


Plaintiff's GAF scores is problematic for a number of reasons. Dr. Deyoub's testimony that the GAF scale does not correlate to occupational functioning, and the ALJ's conclusion that "such a [GAF] score is not a statement about [Plaintiff's] ability to work," is in *direct conflict* with the Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition, Text Revision ("DSM-IV-TR"). Occupational functioning is one of three areas that are rated within the GAF. *See* DSM-IV-TR at 32 (the "GAF scale is to be rated with respect to only psychological, social, *and occupational functioning*.") (emphasis added). The introductory paragraph of the GAF scale instructs the examiner to "[c]onsider psychological, social, *and occupational functioning* on a hypothetical continuum of mental illness." DSM-IV-TR at 34 (emphasis added). The examples contained within the GAF scale include express references to occupational functioning, *e.g.* "conflict with peers or coworkers," "unable to keep a job," "no job." DSM-IV-TR at 34. Furthermore, the Eighth Circuit Court of Appeals has recognized that GAF scores are *relevant evidence* in evaluating a disability claim. *See Pates-Fires v. Astrue*, 564 F.3d 935 (8th Cir. 2009); *Brueggemann v. Barnhart*, 348 F.3d 689 (8th Cir. 2003). *See also* the Appeals Council's earlier decision to remand this case: "Dr. Wooten . . . assessed [a GAF] score of '50' which is indicative of serious psychiatric symptoms in social and occupational functioning." (Tr. 23).

The ALJ also concluded, based on Dr. Deyoub's testimony, that a GAF of 45 to 50 is "in essence, a treatment bias." (Tr. 19). The Court finds this conclusion to be quite troubling. It appears that the ALJ disregarded the GAF scores, in part, because he believed that the examiners assessed those scores as a means of rationalizing Plaintiff's treatment, instead of basing those scores on their professional assessment of Plaintiff's functioning. The Court rejects the ALJ's uncritical acceptance of Dr. Deyoub's testimony concerning "treatment bias" in the GAF. Dr. Deyoub did not support his

purely personal "belief" about "treatment bias" with *any* facts, data, studies, or methodology that would justify the sweeping conclusion reached by the ALJ.[6]

While there *may be* good reasons for discounting Plaintiff's GAF scores, in light of the other evidence in this case, the ALJ's decision is conspicuous in failing to cite *any* of those well established legal and factual grounds for doing so. Instead, the ALJ relied solely on the personal opinion of Dr. Deyoub. The ALJ is obligated to consider all relevant evidence in the record, and "is not free to ignore medical evidence[.]" *See Scott v. Astrue*, 529 F.3d 818, 821 (8th Cir. 2008).

Finally, Plaintiff argues that the ALJ displayed "bias" in the way in which he conducted the administrative hearing:

> Finally, [the ALJ] failed to properly and impartially preside at the second administrative hearing by failing to notify the plaintiff and her counsel that the testimony of both the VE and ME would be conducted telephonically. This is inconsistent with Social Security regulations. He allowed Dr. Deyoub to testify telephonically over the objection of counsel that the witness was biased. He limited cross-examination of this witness with respect to the basis of this testimony. (Tr. 264-65). He allowed the ME to frame the non-exertional portion of the hypothetical question, which is inconsistent with the Hallex. The ALJ even offered unsworn comments about the impartial nature of Dr. Deyoub's past testimony.
>
> In the past, the ALJ has utilized Dr. Deyoub as both a consultative examiner and medical expert in the same case.
>
> In the case of *Cleophus Ford v. Jo Anne B. Barnhart* 4:01CV00592 (E.D. Ark.) Dr. Deyoub acted as both consultative examiner and ME at the request of ALJ Manley. Copies of pages 7, 8 & 13 of the appeal brief and portions of the oral testimony from Ford v. Barnhart are attached here to as Exhibits B and C. To allow the CE to act as ME at the hearing is contrary to the Hallex. A copy of the Hallex is attached hereto as Exhibit D.

---

[6]The Court understands that a medical expert is not required to support every opinion with an express reference to authority. However, the ALJ should have delved further into the basis for Dr. Deyoub's "beliefs" about the GAF, because they facially were inconsistent with the plain text of the DSM-IV.

(*Pltff's App. Brf.* at 16 and n.5). In support of this argument, Plaintiff cites *Goldberg v. Kelly*, 397 U.S. 254, 262-63 (1970), for the proposition that "every individual must be treated fairly and afforded due process of law." (*Pltf's App. Brf.* At 16).

Plaintiff has not presented his arguments with sufficient specificity to allow the Court to make a determination of whether the ALJ's use of the medical expert, including the taking of testimony by telephone, was erroneous. Plaintiff's assertions that the ALJ's actions "violated Social Security regulations" and were "inconsistent with the Hallex" are so vague that it can only guess what specific portions of the "regulations" and "Hallex" Plaintiff believes were violated.[7] If any of these issues arise again on remand, Plaintiff needs to make a better record and brief specific arguments beyond "inconsistencies" with "social security regulations" and "the Hallex" so that the Court can understand the merits of those arguments.

### III. Conclusion

For the foregoing reasons, the Court concludes that substantial evidence does not support the ALJ's RFC assessment. On remand, the ALJ should carefully update the medical record and ensure that he obtains and considers all of the medical evidence to support his RFC assessment. He must properly consider Plaintiff's GAF scores and only discount those scores if warranted under controlling legal authority which recognizes grounds for discounting such scores in appropriate

---

[7]Assuming that the ALJ failed to give Plaintiff the notice required by "the regulations," the Court cannot see how Plaintiff was harmed. Plaintiff clearly had *actual notice* that the ALJ would take testimony by telephone because he submitted a pre-hearing form which objected to that procedure. (Tr. 48).
    The Court is also confused by Plaintiff's contention that the ALJ committed reversible error in using Dr. Deyoub as both a consultative examiner and a "medical examiner" in a *prior case.* Assuming that these dual roles *in a prior case* violated "the Hallex," the Court does not understand how that is relevant *to this case*, where Dr. Deyoub was only used as a "medical examiner," not a consultative examiner.

cases.

IT IS THEREFORE ORDERED THAT the Commissioner's decision is reversed and this matter is remanded to the Commissioner for further proceedings pursuant to "sentence four," within the meaning of 42 U.S.C. § 405(g) and *Melkonyan v. Sullivan*, 501 U.S. 89 (1991).

DATED this 26th day of August, 2010.

_____
UNITED STATES MAGISTRATE JUDGE